**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

KEVIN BIBBINS,
            *Defendant-Appellant.*

No. 09-16775

D.C. No.
2:09-cv-00689-
RLH-GWF

OPINION

Appeal from the United States District Court
for the District of Nevada
Roger L. Hunt, Chief District Judge, Presiding

Argued and Submitted
November 5, 2010—San Francisco, California

Filed April 20, 2011

Before: John T. Noonan, Richard A. Paez, and
Carlos T. Bea, Circuit Judges

Opinion by Judge Paez

## COUNSEL

Richard F. Boulware, Assistant Federal Public Defender, and Franny A. Forsman, Federal Public Defender, Office of the Federal Public Defender, Las Vegas, Nevada, for defendant-appellant Kevin Bibbins.

Roger Yang, Assistant United States Attorney, Robert L. Ellman, Appellate Chief, and Daniel G. Bogden, United States Attorney, United States Attorney's Office, Las Vegas, Nevada, for plaintiff-appellee United States of America.

## OPINION

PAEZ, Circuit Judge:

After a court trial in front of a magistrate judge, Kevin Bibbins was convicted of two misdemeanors: (1) resisting a government employee or agent, in violation of 36 C.F.R. § 2.32(a)(1); and (2) obstructing a license plate, in violation of 36 C.F.R. § 4.2(b) and Nevada Revised Statutes § 482.275. The charges arose out of a traffic stop that escalated into an altercation between Bibbins and four park rangers in Lake Mead National Recreation Area, Nevada. Bibbins appeals both convictions. For the reasons stated below, we affirm.

## I. BACKGROUND[1]

On April 8, 2008, Bibbins was stopped by park rangers Michelle Schonzeit and Eric Westpfahl while he was driving a motor home in Lake Mead National Recreation Area. The motor home was towing a pickup truck. The rangers stopped

---

[1]We draw this factual background from the magistrate judge's Findings and Decision and from evidence presented at Bibbins's trial. Bibbins; park rangers Brian Lake, Therese Picard, Michelle Schonzeit, and Eric Westpfahl; and Dr. Mark Rosen testified at the trial.

Bibbins to inform him that a garbage bag had slipped over the back edge of the pickup truck and had obscured the truck's license plate. After Bibbins pulled over, Schonzeit approached the front cabin of the motor home and informed Bibbins that his truck's license plate was obscured, to which Bibbins replied, "You don't need to see my damn license plate—it's there." Schonzeit then asked Bibbins several times whether he had any weapons in his vehicle. Bibbins eventually told Schonzeit that he did not have any weapons. After dispatching Bibbins's drivers license and registration information to the Las Vegas Metropolitan Police Department (LVMPD), Schonzeit and Westpfahl learned that Bibbins had an active felony warrant from Clark County, Nevada, and that Bibbins's record included prior charges of assaulting officers and other violent conduct. Schonzeit called for assistance, and park rangers Brian Lake and Therese Picard soon reported to the scene. The four rangers all testified that they formulated a plan to ask Bibbins to exit the motor home and walk to the back of the truck so that they could arrest him, per the request of the LVMPD.

Using a microphone, Lake instructed Bibbins to exit the motor home and walk towards the rangers, who were standing at the back of the pickup truck. As Bibbins made his way towards the back of the truck, he was instructed to place his hands above his head, which he did not do. While walking towards the rangers, Bibbins announced that his leg was broken. Three of the rangers testified that they noticed Bibbins walking with a limp, and they all testified that they heard him say his leg was broken as he walked towards the back of the pickup truck. Bibbins was not wearing a walking boot to immobilize his leg, nor was he using crutches. Bibbins testified, however, that he had a walking boot in his motor home, but could not wear it while driving because the width of the boot made it impossible to operate the pedals. Bibbins testified that he did not put on his walking boot after being ordered to leave the motor home because he thought the rangers wanted him to exit immediately. Bibbins also had crutches

in his pickup truck. An audio recording of the event confirms that Bibbins told the rangers that his crutches were in the truck, but the rangers did not allow him to retrieve the crutches.

When Bibbins reached the back of the pickup truck, he tightly gripped the truck's tailgate. Bibbins testified that at that point, his right leg was very sore from driving without the walking boot and he was unable to put his full weight on his right leg. Bibbins further testified that he was worried that his leg would break again if he put his full weight on it. Bibbins also testified that he had not taken his prescribed pain medication that day. Lake testified that he instructed Bibbins not to grab the back of the truck and ordered Bibbins to spread his legs. Bibbins responded by repeating that his leg was broken. The rangers then grabbed Bibbins's arms and attempted to pull them behind his back. Lake grabbed Bibbins's left arm while Schonzeit and Westpfahl grabbed Bibbins's right arm. Picard stood ready to handcuff Bibbins.

At this point, the testimony of the rangers and Bibbins differs. Bibbins testified that the rangers forced his hands behind his back, disengaged, and then tased him. The rangers testified that when they attempted to put Bibbins's hands behind his back, he continued to tightly grip the tailgate of the truck and tensed his arms. The rangers testified that Bibbins then shifted his weight towards Lake (who was standing to Bibbins's left) and raised his right arm. There is inconsistency between the rangers as to whether Bibbins actually freed his right arm from the grip of Schonzeit and Westpfahl. The rangers then let go of Bibbins, backed away, and drew their tasers. Lake ordered Bibbins to get on the ground, to which Bibbins responded, "I can't. My leg is broke." Lake then immediately tased Bibbins in two places in his back. The electronic current from the taser caused Bibbins to fall to the ground. Bibbins then complied with all of the rangers' instructions.[2]

_____

[2]It is worth emphasizing that despite the detailed narrative that the rangers provided, the incident happened very quickly. The magistrate judge

At Bibbins's trial, Dr. Mark Rosen offered expert testimony about the nature of Bibbins's leg injury. Dr. Rosen did not treat Bibbins, but reviewed all of Bibbins's medical records. Dr. Rosen confirmed that Bibbins had broken his leg earlier in 2008, and that his leg had not healed at the time of his arrest. At the time of his arrest, Bibbins was under instructions from his doctor to use his walking boot and crutches and not to put his full weight on his right leg. Dr. Rosen also testified that it would have been painful for Bibbins to walk without crutches or his walking boot, and that it was probably difficult for Bibbins to balance with his legs spread apart. Dr. Rosen also explained that clutching the tailgate of the pickup truck was consistent with Bibbins's testimony that he was trying to avoid putting weight on his injured leg.

In light of all the evidence, the magistrate judge found Bibbins guilty of the charged offenses: (1) resisting a government employee, in violation of 36 C.F.R. § 2.32(a)(1); and (2) obstructing a license plate, in violation of 36 C.F.R. § 4.2(b) and Nev. Rev. Stat. § 482.275. The judge sentenced Bibbins to thirty hours of community service and restricted Bibbins from entering Lake Mead National Recreation Area for one year. Bibbins appealed the magistrate judge's decision to the assigned district judge, who affirmed the convictions. Bibbins timely appealed the district court's final judgment.

## II. ANALYSIS

Because Bibbins appeals a final judgment of the district court, we have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo a lower court's interpretation of a federal reg-

---

observed that "[a]lthough the rangers described the foregoing events in a deliberate, step-by-step manner, the time counter on the video/audio recording indicates that only 20 seconds passed from the point at which Ranger Lake first told [Bibbins] to spread his legs through the completion of the tazering and handcuffing."

ulation. *United States v. Hoff*, 22 F.3d 222, 223 (9th Cir. 1994) (per curiam). We also review de novo a lower court's interpretation of state law. *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 665 (9th Cir. 2003).

## A.   Resisting a Government Employee

**[1]** Bibbins was convicted of violating 36 C.F.R. § 2.32(a)(1), a regulation of the National Park Service that prohibits "[t]hreatening, resisting, intimidating, or intentionally interfering with a government employee or agent engaged in an official duty, or on account of the performance of an official duty." Specifically, Bibbins was convicted of violating the "resisting" offense of the regulation.

**[2]** Bibbins contends that the "resisting" offense of 36 C.F.R. § 2.32(a)(1) contains a willfulness element and that the evidence at trial was insufficient to show that he acted willfully.[3] The question of the mens rea requirement for a violation of the "resisting" offense of § 2.32(a)(1) is one of first impression for this court. We agree with Bibbins that willfulness is a necessary element of the "resisting" violation. We ultimately conclude, however, that substantial evidence supports the magistrate judge's finding that Bibbins acted willfully.

---

[3]Throughout this opinion, we use the words "willful," "purposeful," and "intentional" interchangeably. *See United States v. Awad*, 551 F.3d 930, 939 (9th Cir. 2009) (noting that "in the criminal context, a 'willful' act is 'one undertaken with a bad purpose' ") (quoting *Bryan v. United States*, 524 U.S. 184, 191 (1998)); *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1196 (9th Cir. 2000) (explaining that a " 'purpose' corresponds to the concept of specific intent") (quoting *United States v. Bailey*, 444 U.S. 394, 405 (1980); *Model Penal Code & Commentaries* § 2.02 cmt. at 233-34 (1985)).

1.  *Mens Rea of the "Resisting" Offense of 36 C.F.R. § 2.32(a)(1)*

**[3]** To determine the mens rea for a violation of the "resisting" term of § 2.32(a)(1), we start with the plain language of the regulation.[4] *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980); *United States v. Bucher*, 375 F.3d 929, 932 (9th Cir. 2004); *see also Reno v. Nat'l Trans. Safety Bd.*, 45 F.3d 1375, 1379 (9th Cir. 1995) ("[T]he plain meaning of language in a regulation governs unless that meaning would lead to absurd results."). Section 2.32(a)(1) does not explicitly state a mens rea element. We do not construe this silence to mean that the statute does not include a mens rea requirement. *See United States v. Johal*, 428 F.3d 823, 826-27 (9th Cir. 2005) ("[W]e construe [a] statute in light of the background rules of the common law in which the requirement of some *mens rea* for a crime is firmly embedded.") (quoting *Staples v. United States*, 511 U.S. 600, 605 (1994)) (internal quotation marks omitted). To deduce the mens rea for a violation of the "resisting" offense of § 2.32(a)(1) we must consider the plain meaning of the word "resisting." Because "resisting" is undefined in the regulation, the word "will be interpreted as taking [its] ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979).

**[4]** As the magistrate judge noted, the dictionary definition of the word "resist" is: "to exert oneself to counteract or defeat, strive against: OPPOSE." Webster's Third New International Dictionary 1932 (1993 ed.) (capitalization in origi-

---

[4]Besides looking to the plain language of the statute, we typically also look to the intent of Congress to determine what mental state is required to prove a violation of a statute. *United States v. Nguyen*, 73 F.3d 887, 890 (9th Cir. 1995). In this case, a violation of 36 C.F.R. § 2.32(a)(1) is a regulatory offense. We could not find any relevant regulatory history to advise us of the mental state requirement for a violation of the "resisting" term of § 2.32(a)(1). Accordingly, we focus our analysis on the plain language of the regulation.

nal). From this definition, we do not think a person can "resist" someone or something without forming an intention to do so. Accordingly, we hold that the resisting offense of § 2.32(a)(1) includes a mens rea element of willfulness.[5]

Even if the dictionary definition of "resisting" were ambiguous—which we do not believe it is—several other considerations counsel in favor of a willfulness requirement. First, the structure of § 2.32(a)(1) suggests that willfulness is a necessary element of the "resisting" offense. We generally interpret statutory provisions containing multiple enumerated offenses to require consistent mens rea elements. *See United States v. Vela*, 624 F.3d 1148, 1154 n.9 (9th Cir. 2010); *see also United States v. Crews*, 621 F.3d 849, 856 (9th Cir. 2010). We similarly believe that § 2.32(a)(1) should be interpreted to require consistent mens rea elements for all of its enumerated offenses.

We can not help but notice that all of the offenses contained in § 2.32(a)(1) are actions that are typically done with purpose. The "threatening" offense of § 2.32(a)(1) appears to contain a willfulness requirement because the dictionary definition of "threat" expressly includes an intent component. *See* Webster's Third New International Dictionary 2832 (1993 ed.) (defining a "threat" as an "expression of an *intention* to inflict loss or harm on another by illegal means and especially by means involving coercion or duress of the person threatened." (emphasis added)). Similarly, the "intimidating" offense probably contains a willfulness mens rea element

---

[5]We avoid casting our analysis in terms of "specific intent" and "general intent," because these expressions have long been "the source of a good deal of confusion." *United States v. Bailey*, 444 U.S. 394, 403 (1980). Instead, we employ this court's "preferred practice," and clarify the precise mens rea required by § 2.32(a)(1). *See United States v. Bell*, 303 F.3d 1187, 1191 (9th Cir. 2002) (noting that our court "discourage[s] the use of generic specific intent instructions" and that "[t]he preferred practice . . . is [to give] an intent instruction that properly reflects the intent requirements of the charged offense.").

because the verb "intimidate" is defined as "to make timid or fearful: inspire or affect with fear." *Id.* at 1184. Although one could arguably intimidate someone by accident (for example, as a person is intimidated by a dangerous animal), it seems unlikely that the National Park Service would criminalize accidental intimidation. Thus, we believe the plain meaning of the "intimidating" offense includes a willfulness requirement. Finally, we have previously held the obvious: that the "intentionally interfere" offense of § 2.32(a)(1) requires a showing of the defendant's intent. *Bucher*, 375 F.3d at 934. Therefore, the plain meanings of each of the offenses enumerated in § 2.32(a)(1) all suggest that willfulness is required, which strengthens our conviction that the "resisting" violation also includes such a mens rea element.

Second, our conclusion that the "resisting" violation of § 2.32(a)(1) includes a willfulness element is consistent with our precedent of frequently interpreting Forest Service regulations to require such an element. As we have explained, "[s]trict criminal liability is strong medicine, and, accordingly, we have read criminal intent requirements into some Forest Service regulations, where their language remotely suggested it." *United States v. Kent*, 945 F.2d 1441, 1446 (9th Cir. 1991); *see also United States v. Semenza*, 835 F.2d 223, 225 (9th Cir. 1987) (construing 36 C.F.R. § 261.7(a), which prohibits "allowing unauthorized livestock to enter or be in the National Forest System" to require the government to prove that the violator acted willfully); *United States v. Launder*, 743 F.2d 686, 689 (9th Cir. 1984) (interpreting a statute that prohibits "permit[ting]" or "suffer[ing]" a fire to spread out of control in a national forest to require a showing of willfulness). Our predilection towards reading an intent element into regulations of the National Forest Service also supports our conclusion that in order to prove that a defendant violated the "resisting" offense of § 2.32(a)(1), the government must prove that the defendant acted willfully.

Finally, to the extent that "resisting" has a legal meaning that is distinct from the colloquial definition that we apply

here, the legal connotation of the term confirms the correct-
ness of our holding that the "resisting" offense of § 2.32(a)(1)
contains an element of willfulness. The *Model Penal Code*
("*MPC*") defines two generic misdemeanors that are similar
to the "resisting" offense under § 2.32(a)(1), and both of these
*MPC* definitions require a showing of purposefulness. In par-
ticular, a person commits "Obstructing Administration of Law
or Other Governmental Function" under *MPC* § 242.1 if he
acts *purposefully*. Similarly, a person commits "Resisting
Arrest or Other Law Enforcement" under *MPC* § 242.2 if he
acts "*for the purpose* of preventing a public servant from
effecting a lawful arrest or discharging any other duty."
(emphasis added). To the extent the "resisting" offense in 36
C.F.R. § 2.32(a)(1) was designed to conform to other misde-
meanor offenses that involve resisting an officer or govern-
ment employee, a willfulness mens rea element is appropriate.
Therefore, we conclude that for a defendant to be convicted
of violating the "resisting" offense contained in 36 C.F.R.
§ 2.32(a)(1), the government must prove that the defendant
acted willfully.

2.  *Bibbins's Conviction of Violating § 2.32(a)(1)*

The magistrate judge correctly analyzed the "resisting"
offense as if it included an intent requirement. We therefore
review for substantial evidence Bibbins's challenge to the suf-
ficiency of evidence for his conviction.[6] *United States v.
Douglass*, 780 F.2d 1472, 1476 (9th Cir. 1986). There is sub-

---

[6]Bibbins argues that the magistrate judge incorrectly used a preponder-
ance standard in finding that Bibbins intended to resist the rangers.
Although the magistrate judge could have more artfully explained his
weighing of the evidence, "[a]ppellate review does not require that we sus-
pend reason while interpreting the language employed by [magistrate]
judges." *United States v. Pisello*, 877 F.2d 762, 765 (9th Cir. 1989). We
conclude that the magistrate judge was aware of the government's obliga-
tion to prove its case beyond a reasonable doubt, and we therefore review
Bibbins's conviction for substantial evidence. *Id.*; *see also Williams v.
Stewart*, 441 F.3d 1030, 1049 (9th Cir. 2006).

stantial evidence to support a conviction if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact" could have found Bibbins guilty. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc).

**[5]** We hold that there was substantial evidence in the record to support Bibbins's conviction. Viewing the evidence in the light most favorable to the prosecution, there was evidence that Bibbins tensed his arms and made fists, jerked his right arm out of Schonzeit's and Westpfahl's grip, did not get on the ground when ordered to do so, and rotated his body to the right. Despite Bibbins's uncontradicted testimony that he was under severe pain during the incident and that he repeatedly informed the rangers of his broken leg, a rational factfinder could find that Bibbins willfully resisted the rangers. We therefore conclude that his conviction was supported by substantial evidence.

3.  *Bibbins's Necessity Defense*

We must also address Bibbins's argument that he is entitled to the necessity defense. During closing argument, Bibbins's attorney argued to the magistrate judge that if Bibbins had intentionally resisted the rangers, he had done so out of necessity. The magistrate judge, however, did not mention the necessity defense in his written Findings and Decision. Bibbins renewed his necessity defense argument in his appeal to the district judge, but the district judge similarly did not address the defense in his order. Because Bibbins's attorney did not request special findings under Federal Rule of Criminal Procedure 23(c), we review the district court's denial of Bibbins's necessity defense for substantial evidence. As explained above, there is substantial evidence to support the magistrate judge's rejection of the necessity defense if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact" could have rejected the

defense. *Jackson*, 443 U.S. at 319 (emphasis in original). In other words, to prevail, Bibbins must demonstrate that *no* rational factfinder, after viewing the evidence in the light most favorable to the government, would reject his necessity defense. Bibbins has not made such a showing.

To succeed on his necessity defense, Bibbins must show:

(1) that he was faced with a choice of evils and chose the lesser evil; (2) that he acted to prevent imminent harm; (3) that he reasonably anticipated a causal relation between his conduct and the harm to be avoided; and (4) that there were no other legal alternatives to violating the law.

*United States v. Arellano-Rivera*, 244 F.3d 1119, 1125-26 (9th Cir. 2001). We agree with the district court's rejection of Bibbins's necessity defense because there is substantial evidence to support a finding that Bibbins was not forced to choose between two evils.

**[6]** The first prong of the necessity defense requires a showing that Bibbins was faced with a choice between two evils and chose the lesser one. *See id.* at 1126. This prong reflects the underlying utilitarian principle of the necessity defense. *United States v. Schoon*, 971 F.2d 193, 196 (9th Cir. 1992). We have explained that the necessity defense "justifies criminal acts taken to avert a greater harm, maximizing social welfare by allowing a crime to be committed where the social benefits of the crime outweigh the social costs of failing to commit the crime." *Id.* at 196. Bibbins argues that he was forced to choose between two evils: protecting his leg or resisting the officers. We disagree.

**[7]** Even if we assume without deciding that sustaining leg pain is the kind of "evil" that the necessity defense is designed to prevent, we think a reasonable factfinder, viewing the evidence in the light most favorable to the government,

could find that Bibbins could have protected his leg without resisting the officers. Specifically, Bibbins could have more articulately vocalized his need for medical help or proposed an alternative way to comply with the rangers' instructions. We therefore cannot say that *no* reasonable factfinder would reject Bibbins's necessity defense. Accordingly, we hold that the district court's rejection of Bibbins's necessity defense was supported by substantial evidence, and we affirm his conviction of violating 36 C.F.R. § 2.32(a)(1).

## B.   Obstructing a License Plate

**[8]** Bibbins was also convicted of violating 36 C.F.R. § 4.2(b), which prohibits "[v]iolating a provision of [s]tate law." The district court held that Bibbins violated Nev. Rev. Stat. § 482.275, which provides: "[t]he license plates for a motor vehicle . . . must be attached thereto . . . during the current calendar year or registration period." Section 482.275 also requires that "[e]very license plate must at all times be securely fashioned to the vehicle . . . in a place and position to be clearly visible, and must be maintained free from foreign materials and in a condition to be clearly legible." Critically, § 482.275 applies only to license plates on "motor vehicles." Under Nevada law, a "motor vehicle" is defined as a vehicle that is "self-propelled." Nev. Rev. Stat. § 482.075. It is undisputed that the license plate on Bibbins's towed pickup truck was obstructed by a small garbage bag. The parties dispute whether the pickup truck qualifies as a "motor vehicle" under Nevada law in light of the fact that the truck was towed at the time Bibbins was cited for obstructing the license plate's visibility.

**[9]** There is no authority from the Nevada courts that addresses the question of whether § 482.275 applies to towed vehicles. In deciding this question of first impression, we "must use [our] best judgment to predict how the [Nevada] Supreme Court would decide [the] issue." *Helfand v. Gerson*, 105 F.3d 530, 537 (9th Cir. 1997). In so doing, we may "be

aided by looking to well-reasoned decisions from other juris-dictions." *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980).

**[10]** Bibbins argues that a towed vehicle, by definition, is not self-propelled. We disagree. We think the most sensible interpretation of the term "self-propelled" is that the word defines a quality rather than an action. To conclude that "self-propelled" refers to an action would lead to the absurd result that a vehicle ceases to be a "motor vehicle" under Nevada law whenever it is parked, stopped, or not powering itself.

**[11]** We are also persuaded by the courts of other states, which have uniformly held that the term "self-propelled" describes a quality that is not abated when a vehicle is not propelling itself. *See, e.g.*, *Asay v. Watkins*, 751 P.2d 1135, 1136 (Utah 1988); *State v. Tacey*, 150 A. 68, 69 (Vt. 1930); *see also Parnell v. State*, 261 S.E.2d 481, 482 (Ga. App. 1979); *State v. Ridinger*, 266 S.W.2d 626, 631 (Mo. 1954); *Rogers v. State*, 183 S.W.2d 572, 572 (Tex. Crim. App. 1944); *State v. McGary*, 683 P.2d 1125, 1127 (Wash. App. 1984). As the Vermont Supreme Court explained, "[m]anifestly it was the design, mechanism, and construction of the vehicle, and not its temporary condition, that the Legislature had in mind when framing the definition of a motor vehicle." *Tacey*, 150 A. at 69. We find this reasoning convincing. Moreover, two treatises with entries on "motor vehicles" both conclude that a vehicle remains "self-propelled" when it is towed or inoperable. *See* 60 C.J.S. Motor Vehicles § 1; 7A Am.Jur.2d Automobiles § 5.

**[12]** To support his contention that his pickup truck was not self-propelled while it was being towed, Bibbins relies on an opinion by the Nevada Attorney General, which states that "[a]lthough a dune buggy is capable of self-propulsion, it is not self-propelled while being towed on the highways of Nevada, and as such it is not a motor vehicle as defined by NRS 482.075." 1969 Nev. Op. Atty. Gen. No. 619 (Septem-

ber 18, 1969). Opinions of the Nevada Attorney General are not binding on the Nevada courts. *Blackjack Bonding v. City of Las Vegas Mun. Court*, 116 Nev. 1213, 1218 (Nev. 2000). We are not persuaded by the 1969 opinion, which contains scant reasoning to support its conclusion that dune buggies are not motor vehicles while being towed. Because it would be illogical to consider "self-propelled" an impermanent quality, we affirm Bibbins's conviction for obscuring a license plate, in violation of 36 C.F.R. § 4.2(b).

## III.   CONCLUSION

Because substantial evidence supports Bibbins's conviction for willfully violating 36 C.F.R. § 2.32(a)(1), we AFFIRM his conviction. We also AFFIRM Bibbins's conviction for violating 36 C.F.R. § 4.2(b).

**AFFIRMED.**